## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ABDUR-RAHMAN KANTAMANTO,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO. 06-3371** |
| | : | |
| **LEON KING, Commissioner of Prisons;** | : | |
| **OSIE M. BUTLER, Deputy Warden; and,** | : | |
| **LORENZO NORTH, Union Leader,** | : | |
| **Defendants.** | : | |

**DuBOIS, J.**                                                                                      **JULY 2, 2009**

## M E M O R A N D U M

### I.      INTRODUCTION

Plaintiff, Abdur-Rahman Kantamanto, a former prisoner in the Philadelphia Prison System ("PPS"), brings this civil rights action pursuant to 42 U.S.C. § 1983.  Defendants were at all times material to this action PPS employees.  The gravamen of plaintiff's Complaint is that defendants terminated plaintiff from his job at the Curran-Fromhold Correctional Facility ("CFCF") law library in violation of his rights under the First and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

Plaintiff alleges in his Complaint that defendants terminated him in retaliation for his publication of an article entitled "A Big Hell Hole (Gulag)," which was critical of the conditions at PPS prisons and the conduct of PPS correctional officers.  In particular, the Complaint alleges that Union Leader Lorenzo North, then the correctional officer in charge of the law library, fired plaintiff from his job because Correctional Officer ("C.O.") North was angered by the article.  Plaintiff avers that Commissioner Leon King and Deputy Warden Osie Butler failed to reinstate

plaintiff or otherwise redress his grievance against C.O. North.

Defendants argue that the motivation for plaintiff's termination was not retaliatory. Instead, defendants aver that plaintiff's "close custody" status rendered him ineligible for employment in the law library and that, as a result, a newly instituted computer system removed him from his job. Defendants also argue that they are entitled to qualified immunity.

Presently before the Court is defendants' Second Motion for Summary Judgment. For the reasons set forth below, defendants' motion is granted in part and denied in part. The Court denies defendants' motion with respect to plaintiff's First Amendment retaliation claim against C.O. North. The Court also denies defendants' motion on the grounds of failure to exhaust and qualified immunity with respect to C.O. North. The Court grants defendants' motion as to all other claims against C.O. North. The Court grants defendants' motion as to all claims against Commissioner King and Deputy Warden Butler.

## II.    BACKGROUND

At all times relevant to this action, plaintiff was incarcerated at CFCF, a PPS facility. (Abdur-Rahman Kantamanto Dep. 6:17–22, Nov. 21, 2008; Willette Furtick Dep. 5:20–7:6, Nov. 25, 2008.) Plaintiff wrote an account of his confinement at CFCF, which was published as "A Big Hellhole (Gulag)" in the April 2006 edition of the Black Star newspaper. (Abdur-Rahman Kantamanto, A Big Hellhole (Gulag), Black Star, Apr. 2006, at 6, Ex. A to Defs.' Mot.) The byline for the article read "Bro. A-R K," and the contact information following the article included plaintiff's Philadelphia Police identification number, "578168-CFCF." (Id.) Plaintiff testified that he had intended the article to be published anonymously but that the Black Star had printed his identification number without his knowledge. (Kantamanto Dep. 41:3–42:16.)

At the time of the publication of the article, plaintiff worked the 3:00 p.m.–11:00 p.m. shift in the CFCF law library, where he was supervised by C.O. North. (Kantamanto Dep. 13:22–17:7; Lorenzo North Dep. 47:25–48:24, Nov. 21, 2008.) According to plaintiff, when he reported for work on April 19, 2006, C.O. North was very angry about the <u>Black Star</u> article. (Kantamanto Dep. 23:9–24:3.) Plaintiff testified further that C.O. North said "[i]f you're going to write, you know, stories like that about us, you know, in the newspaper then you're fired" and terminated plaintiff from his law library position. (<u>Id.</u> at 24:6–23.) C.O. North disputed this account, testifying that he had never heard of plaintiff's article and that he did not fire plaintiff. (North Dep. 51:23–53:8, 82:16–83:20.) C.O. North explained that he did not have the authority to hire or fire employees, which was instead the responsibility of the social worker. (<u>Id.</u> at 60:11–24.) Deputy Warden Butler testified that a new computer system was instituted in CFCF in 2006 that removed prisoners from jobs if they did not have the correct custody status for such employment. (Osie Butler Dep. 66:10–71:2, Nov. 25, 2008.) Plaintiff's status was close custody, which did not technically permit him to work in the law library. (<u>Id.</u> at 65:22–66:1; Christopher Thomas Decl. ¶¶ 7–8, July 28, 2008, Ex. V to Defs.' Mot.)

On May 5, 2006, plaintiff filed an Inmate Grievance Form ("Grievance 1") concerning his termination from his law library job. (PPS Lock & Track Records, Grievance 1, Ex. P to Defs.' Mot.) On May 18, 2006, Deputy Warden Butler recommended that, in response to plaintiff's grievance, C.O. North would be directed to follow PPS policies regarding prisoner employment. (<u>Id.</u>) Warden Gainey approved of this recommendation. (<u>Id.</u>) On June 1, 2006, plaintiff filed a second Inmate Grievance Form ("Grievance 2") relating to his termination. (PPS Lock & Track Records, Grievance 2, Ex. Q to Defs.' Mot.) According to plaintiff, C.O. Barry Painter told him

that his law library job had been reinstated, but Deputy Warden Butler would not let plaintiff

return to work in the library.  (Id.)  On June 29, 2006, Deputy Warden Butler found that plaintiff

had been given "false information" by C.O. Painter and recommended job reclassification and

back pay for June 2006.  (Id.)  Warden Gainey approved of the recommendation.  (Id.)  There is

no record of appeal of either of these grievances to Commissioner King; plaintiff testified,

however, that he sent a letter to Commissioner King appealing the resolution of his grievances.

(Kantamanto Dep. 29:16–25.)

According to plaintiff, he was never reinstated to his law library job and, despite his

efforts, he was not offered different employment at CFCF.  (Kantamanto Dep. 44:1–45:15.)

## III.     PROCEDURAL HISTORY

On July 31, 2006, *pro se* plaintiff filed a Complaint in this Court pursuant to 42 U.S.C.

§ 1983 naming as defendants Commissioner Leon King, Deputy Warden Osie M. Butler, and

Union Leader Lorenzo North.  The Complaint alleged that plaintiff was "unfairly dismissed from

[his] job in retaliation" for the exercise of his First Amendment rights.  (Compl. 5.)  Plaintiff

requested two forms of relief:  (1) compensatory damages of $50,000 to reimburse plaintiff for

"undue anxieties" and "pain and suffering" due to his retaliatory termination and (2) punitive

damages of $500,000 for violation of plaintiff's constitutional rights.[1]  (Id.)  Plaintiff declared the

---

[1] The Court notes that the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), imposes a limitation on the recovery of compensatory damages:  "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  This restriction, however, does not preclude recovery for plaintiff.

The bar against compensatory damages does not prohibit all damages claims.  Allah v. Al-Hafeez, 226 F.3d 247, 251 (3d Cir. 2000).  "[C]ertain absolute constitutional rights may be vindicated by an award of nominal damages in the absence of any showing of injury warranting compensatory damages. . . . [F]ederal courts have consistently awarded nominal damages for

4

truth of the allegations in the Complaint under penalty of perjury. (Id.)

On January 25, 2008, defendants filed their first Motion for Summary Judgment. Prior to responding to defendants' motion, plaintiff requested permission to seek additional discovery, including depositions and interrogatories. On May 15, 2008, the Court ordered that on or before July 25, 2008, plaintiff had to file a response to defendants' Motion for Summary Judgment, which could include specific requests for additional discovery. The Court also ordered plaintiff to provide a copy of the newspaper article on which the lawsuit was based by July 25, 2008. Plaintiff filed his response on July 9, 2008, but he did not timely provide a copy of the newspaper article. By Order dated July 31, 2008, the Court determined that "plaintiff's *pro se* Response to Defendants' Motion for Summary Judgment was inadequate in that plaintiff did not present any evidence and instead requested additional time to present evidence . . . ." The Court ordered plaintiff to provide a copy of his article by August 21, 2008. The Court further instructed that if

violations of First Amendment rights." Id. (internal citations omitted). Moreover, although plaintiff does not expressly seek nominal damages in his Complaint, the Third Circuit has held that "it is not necessary to allege nominal damages . . . ." Basista v. Weir, 340 F.2d 74, 87 (3d Cir. 1965).

Plaintiff also seeks punitive damages, which may "be awarded based solely on a constitutional violation, provided the proper showing is made." Allah, 226 F.3d at 251. The Third Circuit has interpreted § 1997e(e) as permitting claims for punitive damages. "[T]o the extent that [plaintiff's] punitive damages claims stem solely from the violation of his [constitutional] rights, and not from any emotional or mental distress suffered therefrom, those claims are not claims brought 'for mental or emotional injury suffered' and are not barred by § 1997e(e)." Id. at 252.

Thus, under Third Circuit precedent, despite the restriction of § 1997e(e), plaintiff may pursue both nominal and punitive damages as redress for the alleged violations of his constitutional rights. "Claims seeking nominal or punitive damages are typically not 'for' mental or emotional injury but rather 'to vindicate constitutional rights' or 'to deter or punish egregious violations of constitutional rights,' respectively. Accordingly, regardless how we construe § 1997e(e)'s physical injury requirement, it will not affect [the plaintiff's] ability to seek nominal or punitive damages for violations of his constitutional rights." Mitchell v. Horn, 318 F.3d 523, 533 (3d Cir. 2003) (internal citation omitted).

plaintiff did not meet this deadline, the Court would grant defendants' Motion for Summary Judgment. If, however, plaintiff did provide a copy of the article by the deadline, he would be permitted to take certain depositions and arrange for obtaining other evidence. By letter dated August 7, 2008, plaintiff sent the Court a copy of the cover of the April 2006 edition of the Black Star and his article that was published therein.

Depositions were conducted at the James A. Byrne United States Courthouse for the Eastern District of Pennsylvania in November 2008. Plaintiff was deposed by counsel for defendants on November 21, 2008. Plaintiff deposed Union Leader Lorenzo North and C.O. Theodore Jackson on November 21, 2008; C.O. Barry Painter on November 24, 2008; and C.O. Willette Furtick and Deputy Warden Osie Butler on November 25, 2008.[2]

By letter to the Court dated November 26, 2008, defendants reported their intention to file an amended Motion for Summary Judgment. On January 6, 2009, the Court gave defendants leave to file a second Motion for Summary Judgment including all of the issues raised in the first Motion for Summary Judgment and all other issues deemed appropriate by defendants. On January 30, 2009, defendants filed the instant Second Motion for Summary Judgment. In the motion, defendants seek entry of judgment in their favor and the dismissal with prejudice of plaintiff's lawsuit. On February 3, 2009, the Court denied defendants' first Motion for Summary Judgment as moot.

_____

[2] The parties did not provide complete copies of the transcripts of these depositions with their filings with respect to the instant motion. Following the taking of the depositions, however, plaintiff contacted the Court with concerns regarding the conduct of defendants' counsel during the depositions. To assess the validity of plaintiff's concerns, the Court requested complete copies of the deposition transcripts. The Court has reviewed and relied upon the full transcripts of all of the depositions in ruling on the instant Motion for Summary Judgment.

## IV.    LEGAL STANDARD

A court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  A factual dispute is material when it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007) (citations omitted); accord Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.  Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (citations omitted).  The nonmoving party "must set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

## V.    DISCUSSION

### A.    Introduction

Plaintiff brings suit under 42 U.S.C. § 1983, which creates a cause of action, *inter alia*, if a person is deprived of a constitutional right by someone acting under color of state law.  28 U.S.C. § 1983.  "'[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an

individual for exercise of a constitutional right.'" Allah v. Seiverling, 229 F.3d 220, 224–25 (3d Cir. 2000) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 386 (6th Cir. 1999) (*en banc*)). Plaintiff alleges that his transfer violated both his substantive First Amendment and due process rights and his right to procedural due process, and that defendants, as employees of PPS, acted under color of state law. The Court's jurisdiction is based on 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

## B. Exhaustion Requirement of the Prison Litigation Reform Act

Defendants argue that plaintiff's claims fail as a matter of law because he failed to exhaust the administrative remedies available to him within the Philadelphia Prison System ("PPS"). (Defs.' Mot. 12–14.) This argument relies on the exhaustion requirement of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

The exhaustion requirement of the PLRA mandates that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The Supreme Court has held that this exhaustion requirement is mandatory and that a prisoner must *properly* exhaust administrative remedies. Woodford v. Ngo, 548 U.S. 81, 85, 90–92 (2006). "[T]he prison's requirements . . . define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007); accord Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004). Proper exhaustion requires pursuing a grievance through all available levels of appeal. Woodford, 548 U.S. at 89, 93; Spruill, 372 F.3d at 232. Failure to exhaust is an affirmative defense, accordingly, defendants bear the burden of proof. Jones, 549 U.S. at 216.

The Third Circuit has held that "§ 1997e(a), as amended by the PLRA, completely precludes a futility exception to its mandatory exhaustion requirement." Nyhuis v. Reno, 204 F.3d 65, 71 (3d Cir. 2000). In other words, even if the prison grievance process cannot afford the prisoner with the relief that he seeks in federal court, he nevertheless must exhaust all available administrative remedies. Id. at 68–69. "The availability of administrative remedies to a prisoner is a question of law." Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002) (citation omitted). If a prison official prevents a prisoner from exhausting administrative remedies, such remedies are not "available" to the prisoner within the meaning of § 1997e(a). Id. at 113; Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) ("We believe that a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a) . . . ."). For example, a failure to exhaust is excused if the prison fails to provide necessary grievance forms. Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003).

In the instant case, defendants argue that plaintiff failed to properly exhaust the administrative remedies available at Curran-Fromhold Correctional Facility ("CFCF") as he did not avail himself of all levels of appeal. (Defs.' Mot. 14.) Specifically, defendants argue that plaintiff failed to appeal the responses of Deputy Warden Butler and Warden Gainey to his two grievances to Commissioner King, the final step of the grievance process. (Id.) In his response, plaintiff concedes that he failed to formally appeal his two grievances to Commissioner King but argues that CFCF "[d]oesn't have a [g]rievance appeal form, so it is impossible to file a formal official appeal . . . ." (Pl.'s Resp. 20.) In other words, plaintiff argues that an appeal to the Commissioner was not "available," so he was not required to pursue it.

As an attachment to their Motion for Summary Judgment, defendants provide a copy of

the Philadelphia Prison System ("PPS") Policy 3.F.10, Inmate Grievance Procedures. (PPS Policy 3.F.10 (June 29, 2005), Ex. O to Defs.' Mot.) "Complete copies of the Inmate Grievance Procedures in English and Spanish will be posted in all housing units, inmate law libraries, and social service areas." (Id. at 4.) Moreover, Policy 3.F.10 provides that upon admission, prisoners will be given the Inmate Handbook, which details the entire grievance process and that orientation will include an explanation of the grievance procedures. (Id.) To file a grievance, a prisoner places a grievance form in a grievance box. (Id. at 6.) The Deputy Warden reviews the grievance and either rejects it, attempts to resolve it herself, or distributes it to the appropriate staff member to resolve. (Id.) The Deputy Warden also forwards the Finding of Inmate Grievance to the Warden for review. (Id.) The Warden reviews the recommended action of the Deputy Warden; approves, denies, or modifies it; notes his decision on the Finding of Inmate Grievance Form; and forwards signed copies to the prisoner. (Id. at 7.) "If an inmate is unsatisfied with the Warden's decision, the inmate has five (5) days after receipt of the Finding of Inmate Grievance to appeal to the Commissioner . . . . The inmate should include copies of the grievance filed, the Finding of Inmate Grievance, and *appeal form*." (Id. (emphasis added).) It is this appeal form that plaintiff contends was unavailable. With respect to the initial grievance, Policy 3.F.10 provides that "[i]f there are no forms available, a grievance written out on a plain sheet of paper will be accepted if all the required information is present." (Id. at 4.) Policy 3.F.10 does not expressly state whether this alternative procedure also applies if *appeal forms* are unavailable.

The evidence of record concerning plaintiff's appeal of his grievance is as follows. On May 5, 2006, plaintiff filed an Inmate Grievance Form ("Grievance 1") stating that, on April 19,

2006, C.O. North had fired him from his law library job, that he felt "unfairly dismissed from [the] job because of an article in newspaper," and that he wished his job to be reinstated. (PPS Lock & Track Records, Grievance 1, Ex. P to Defs.' Mot.) Grievance 1 was referred to Deputy Warden Butler; on May 18, 2006, she recommended that "C/O North will be instructed to follow Policy 5.A.5 Work and Correctional Industries."[3] (Id.) Warden Gainey approved of this recommendation and signed the Finding of the Inmate Grievance. (Id.) Plaintiff likewise signed the Finding of the Inmate Grievance. (Id.) The records disclose that Grievance 1 was reviewed by Deputy Warden Butler and Warden Gainey but do not reference any further review by Commissioner King. (Id.)

On June 1, 2006, plaintiff filed a second Inmate Grievance Form ("Grievance 2") relating to his termination from his position in the law library. (PPS Lock & Track Records, Grievance 2, Ex. Q to Defs.' Mot.) According to plaintiff, C.O. Painter told him that his law library job had been reinstated, but Deputy Warden Butler disagreed and stated that plaintiff could not return to work in the library. (Id.) On June 29, 2006, Deputy Warden Butler found that plaintiff had been given "false information" by C.O. Painter and recommended that "[a] job reclassification will be filed and given to [plaintiff's] social worker. Because this was not done before C/O North left, inmate will be put in for back pay [for] June 2006." (Id.) Warden Gainey approved of the recommendation and signed the Finding of the Inmate Grievance; plaintiff, however, did not sign the Finding. (Id.) The records relating to Grievance 2 likewise show review by Deputy Warden Butler and Warden Gainey but no review by Commissioner King. (Id.)

---

[3] The PPS policy entitled Work and Correctional Industries is 5.A.2, not 5.A.5. (PPS Policy 5.A.2 (Apr. 4, 2001), Ex. K to Pls.' Mot.) Policy 5.A.5 is Job-Related Discipline of Inmates. (Id. at 11.)

In the Complaint, which plaintiff verified was true under penalty of perjury, plaintiff stated that "when I asked the Deputy Warden for an appeal form[,] [t]he Deputy Warden became angry at me because I wouldn't sign[] the [g]rievance . . . dated June 29, 2006. The Deputy Warden denied my rights to appeal." (Compl. 4.) Plaintiff reiterated this contention during his deposition. He testified that Deputy Warden Butler's resolution of his grievance was to instruct C.O. North to follow prison policies and that this was "not . . . agreeable with [plaintiff]." (Kantamanto Dep. 29:1–13.) According to plaintiff, he attempted to appeal the decision to Commissioner King in the presence of Deputy Warden Butler, but "she denied it." (Id.) In his response to defendants' Motion for Summary Judgment, plaintiff contended that CFCF as an institution did not provide appeal forms. (Pl.'s Resp. 20, 24.) According to plaintiff, instead of using an official appeal form, he sent a letter to Commissioner King "detailing the injury that resulted from retaliation of [s]tate [c]orrectional [e]mployees and [o]fficers for [plaintiff's] enjoyment of his First Amendment right . . . on or about April 2006." (Kantamanto Aff. re Leon King ¶ 4, May 4, 2009, Ex. B. to Pl.'s Resp.) Plaintiff testified to similar effect at his deposition, stating that he sent a letter to Commissioner King but never received a response. (Kantamanto Dep. 29:20–25.) Plaintiff, however, does not have a copy of his letter to Commissioner King. (Id.)

At her deposition, Deputy Warden Butler testified that plaintiff was angry after he was informed of the resolution of his grievance and left her office before completing the necessary documentation to appeal to Commissioner King. (Butler Dep. 37:10–40:18, 64:23–65:9.) She also testified that a prisoner "cannot be denied an appeal. [The prisoner] can write a letter to the Commissioner, attach [the] grievance to it, make a copy of it, and he'll answer it." (Id. at

65:7–9.)  On examination by defense counsel, Deputy Warden Butler further clarified the appeal

process, stating that prisoners "can check that it's unacceptable to them, they could either ask for

a form, if the form is not there and not given to them, they could write it and attach the grievance

to it and mail it to the Commissioner . . . . [T]he Commissioner will return it back to me, I will

call the person in there, I get a copy, I put it in their file and they get . . . the original . . . ."  (Id. at

72:15–25.)  According to Deputy Warden Butler, she cannot prevent a prisoner from appealing;

moreover, a prisoner does not have to submit a specific form to file an appeal and can instead

write directly to the Commissioner.  (Id. at 73:1–5.)  This alternative appellate procedure,

however, is not specifically mentioned in PPS Policy 3.F.10.

    This evidence creates genuine issues of material fact as to whether (1) Deputy Warden

Butler denied plaintiff access to an appeal form; (2) if so, whether plaintiff knew that he could

appeal the resolution of his grievance through a letter to Commissioner King; and (3) whether

plaintiff indeed sent a letter to Commissioner King.  Plaintiff's statement under penalty of

perjury in his Complaint that he was denied a grievance form, his averment that he sent a letter to

Commissioner King, and his deposition testimony suffice to establish that whether he was

reasonably able to exhaust is in dispute.  Accordingly, whether an appeal to Commissioner King

was an "available" administrative remedy for the purposes of § 1997e(a) cannot be conclusively

resolved as a matter of law at the summary judgment stage.  For all of these reasons, the Court

denies defendants' Motion for Summary Judgment on the ground of failure to exhaust

administrative remedies.

## C.    First Amendment Retaliation Claim[4]

### 1.    Legal Framework

To prevail on a retaliation claim, a prisoner-plaintiff must make a three-part showing. First, as a threshold matter, the prisoner must "prove that the conduct which led to the alleged retaliation was constitutionally protected." Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (citations omitted). Next, the prisoner "must show that he suffered some 'adverse action' at the hands of the prison officials." Id. (citation omitted). The prisoner satisfies the adverse action requirement by "demonstrating that the action 'was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'" Id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)). Finally, the prisoner must demonstrate "a causal link between the exercise of his constitutional rights and the adverse action taken against him." Id. A causal link is established when the "constitutionally protected conduct was a substantial or motivating factor in the decision to discipline [the prisoner]." Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (citing Rauser, 241 F.3d at 333). Once the prisoner has made this *prima facie* case, the burden shifts to the defendant prison officials who "may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. "At the summary judgment stage, the

---

[4] Plaintiff also asserts a retaliation claim pursuant to Article I, section 7 of the Pennsylvania Constitution, which states, in relevant part that "[t]he printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." For purposes of this Memorandum, the Court will address this claim in the context of the First Amendment to the United States Constitution.

plaintiff need only meet his burden of producing evidence from which a reasonable jury could conclude that the adverse action was taken in retaliation for the exercise of his protected rights." Booth v. King, 346 F. Supp. 2d 751, 762 (E.D. Pa. 2004). To withstand summary judgment and submit the question of causation to a factfinder, the plaintiff must "produce[] evidence from which a reasonable jury could conclude that the exercise of his right was a 'substantial and motivating factor' in defendants' actions . . . ." Id.

Defendants have conceded that the publication of an article in a newspaper is protected by the First Amendment. (Defs.' Mot. 18.) Such publication implicates a core First Amendment freedom. Hence, plaintiff's conduct was constitutionally protected.

Plaintiff alleges that defendants took the following adverse action against him: C.O. North fired plaintiff, directed profanity at him, and threatened him with bodily harm. (Kantamanto Aff. re Lorenzo North ¶¶ 1, 5, May 4, 2009, Ex. D. to Pl.'s Resp.; Kantamanto Dep. 15:15–16:12, 23:5–24:23, 25:2–27:18, 34:10–18.) Deputy Warden Butler failed to communicate plaintiff's grievances to Commissioner King and directed C.O. North to use PPS Policy 5.A.5[5] to conceal the retaliatory termination. (Kantamanto Aff. re Osie Butler ¶¶ 3–7, 10, 14–15, May 4, 2009, Ex. A to Pl.'s Resp.; Kantamanto Dep. 28:8–29:19.) Commissioner King failed to protect plaintiff from retaliatory conduct, even after receiving a letter from plaintiff detailing the

---

[5] While Deputy Warden Butler referenced PPS Policy 5.A.5, Work and Correctional Industries, in her Finding of the Inmate Grievance, the PPS policy entitled Work and Correctional Industries is 5.A.2, not 5.A.5. (PPS Lock & Track Records, Grievance 1, Ex. P to Defs.' Mot.; PPS Policy 5.A.2 (Apr. 4, 2001), Ex. K to Defs.' Mot.) Policy 5.A.5 is Job-Related Discipline of Inmates. (PPS Policy 5.A.2 at 11.)

circumstances of his termination.[6]  (Kantamanto Aff. re Leon King; Kantamanto Dep. 29:20–25, 31:8–18.)

At their depositions, defendants contradicted some of plaintiff's allegations.  C.O. North testified that he did not fire plaintiff from his law library position and did not direct profanity at plaintiff.  (North Dep. 60:11–24, 82:21–83:12.)  C.O. North further explained that he did not have the authority to fire a prisoner himself but that he would have to give a form to the social worker, who would notify the prisoner of the termination.  (Id. at 69:4–18.)  Deputy Warden Butler testified that plaintiff's grievance was not communicated to Commissioner King because plaintiff himself did not do what was necessary to appeal the resolution of his grievance.  (Butler Dep. 37:6–38:9, 64:23–65:9.)  She further testified that she cannot prevent a prisoner from appealing to the Commissioner and that the prisoner does not have to use a particular appeal form but can instead just send a letter.  (Id. at 72:15–73:5.)  She confirmed that she recommended that C.O. North review PPS policy concerning prisoner employment and classification in response to plaintiff's grievance.  (Id. at 49:4–14, 63:10–15.)

This evidence creates a disputed issue of material fact as to whether C.O. North terminated plaintiff from his law library position.  Examining the record in the light most favorable to plaintiff, the nonmoving party, there is evidence supporting plaintiff's allegation that C.O. North fired plaintiff from his law library job.  Such termination satisfies the "adverse action" requirement of Rauser with respect to C.O. North as it would be "'sufficient to deter a

---

[6] Plaintiff also alleges that C.O. Jackson took adverse action against him, including threatening plaintiff with bodily harm and directing profanity at plaintiff.  (Kantamanto Aff. re Theodore Jackson ¶¶ 1–2, May 4, 2009, Ex. C to Pl.'s Resp.; Kantamanto Dep. 11:1–23, 12:2–13.)  C.O. Jackson, however, is not named as a defendant to the instant action, and the Court declines to address the merits of the claims against C.O. Jackson.  See infra Part V.E.

16

person of ordinary firmness from exercising his [constitutional] rights.'" 241 F.3d at 333

(quoting <u>Allah</u>, 229 F.3d at 225).

With respect to Commissioner King and Deputy Warden Butler, they cannot be held

liable under § 1983 solely on the ground that they supervised C.O. North, who allegedly took

adverse action against plaintiff. "It is well settled that the doctrine of respondeat superior may

not be employed to impose § 1983 liability on a supervisor for the conduct of a subordinate

which violates a citizen's constitutional rights." <u>Blanche Road Corp. v. Bensalem Twp.</u>, 57 F.3d

253, 263 (3d Cir. 1995), <u>abrogated on other grounds by</u> <u>United Artists Theatre Circuit, Inc. v.</u>

<u>Twp. of Warrington, Pa.</u>, 316 F.3d 392 (3d Cir. 2003); <u>accord</u> <u>C.H. ex rel. Z.H. v. Oliva</u>, 226

F.3d 198, 201–02 (3d Cir. 2000); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988).

Instead, for a supervisor to face responsibility, she must be personally involved in the alleged

wrongs. "Personal involvement can be shown through allegations of personal direction or of

actual knowledge and acquiescence. Allegations of participation or actual knowledge and

acquiescence, however, must be made with appropriate particularity." <u>Rode</u>, 845 F.2d at 1207.

For a failure to supervise claim, the plaintiff must prove that the defendant "exhibited deliberate

indifference to the plight of the person deprived." <u>Sample v. Diecks</u>, 885 F.2d 1099, 1118 (3d

Cir. 1989). To show deliberate indifference, the plaintiff must "identify a specific supervisory

practice that the defendant failed to employ" and "allege 'both (1) contemporaneous knowledge

of the offending incident or knowledge of a prior pattern of similar incidents, and (2)

circumstances under which the supervisor's inaction could be found to have communicated a

message of approval.'" <u>C.H.</u>, 226 F.3d at 202 (quoting <u>Bonenberger v. Plymouth Twp.</u>, 132 F.3d

20, 25 (3d Cir. 1997)) (further citation omitted). Alleging solely that the defendant failed to

supervise in a manner that would have prevented a First Amendment violation is insufficient.  Id.

In the instant case, the essence of plaintiff's allegations against Commissioner King and Deputy Warden Butler is that, after being apprised of the claimed retaliatory conduct by C.O. North, they failed to take corrective action in response to plaintiff's grievances.  Such allegations do not rest on respondeat superior liability but instead contend that Commissioner King and Deputy Warden Butler were themselves involved in the alleged wrong.  Whether plaintiff's allegations and evidence suffice to demonstrate deliberate indifference by Commissioner King and Deputy Warden Butler is an issue that need not be addressed, however, because, as discussed *infra*, the Court concludes that plaintiff has not met the causation requirement with respect to Commissioner King and Deputy Warden Butler.

Having met the adverse action requirement, plaintiff must also provide evidence of a causal connection between the exercise of his constitutional rights and defendants' adverse actions to withstand summary judgment.  "[T]he plaintiff need only meet his burden of producing evidence from which a reasonable jury could conclude that the adverse action was taken in retaliation for the exercise of his protected rights."  Booth, 346 F. Supp. 2d at 762.  At his deposition, plaintiff testified that C.O. North said "[i]f you're going to write, you know, stories like that about us, you know, in the newspaper then you're fired."  (Kantamanto Dep. 24:5–8.)  Plaintiff also presented evidence that the article was published in early April 2006 and that he was terminated by C.O. North on April 19, 2006.  (Kantamanto Dep. 14:13–16:12, 23:21–24, 24:18–19.)  In Rauser, the Third Circuit held that "suggestive temporal proximity" is relevant to causation in a retaliation case.  241 F.3d at 334 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)).  C.O. North disputed plaintiff's account, testifying that he had

never read plaintiff's article and that he did not fire plaintiff from the law library. (North Dep. 51:23–52:3, 82:24–83:14.) Deputy Warden Butler testified concerning a new computer system instituted in CFCF in 2006 that removed prisoners from jobs if they did not have the correct custody status for such employment. (Butler Dep. 66:10–71:2.) She suggested that the operation of this computer system may have resulted in plaintiff's termination. (Id.)

This evidence creates a genuine issue of material fact as to the reason that plaintiff was terminated from his law library job. Viewing the record in the light most favorable to plaintiff, the factfinder could conclude that C.O. North terminated plaintiff in retaliation for his exercise of his First Amendment rights. With respect to C.O. North, plaintiff has met his burden of "produc[ing] evidence from which a reasonable jury could conclude that the exercise of his right was a 'substantial and motivating factor' in defendant['s] actions." Booth, 346 F. Supp. 2d at 762. Thus, the Court denies defendants' Motion for Summary Judgment with respect to the First Amendment retaliation claim against C.O. North.

With respect to Commissioner King and Deputy Warden Butler, however, the record does not demonstrate such a causal link. While the evidence can support a finding that both knew that plaintiff had published an article, this, without more, is insufficient to demonstrate that such knowledge was a "substantial and motivating" factor in their conduct. For this reason, the Court grants defendants' Motion for Summary Judgment with respect to the First Amendment retaliation claims against Commissioner King and Deputy Warden Butler.

## 2. Qualified Immunity

Defendants assert that they are entitled to summary judgment on the basis of qualified immunity. (Defs.' Mot. 23–26.) As the Court grants defendants' Motion for Summary Judgment

with respect to the First Amendment retaliation claims against Commissioner King and Deputy Warden Butler, the Court will limit its discussion to whether C.O. North is eligible for qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, --- U.S. --- , 129 S.Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The qualified immunity analysis involves two steps:  a court "must decide whether the facts that a plaintiff has alleged . . . or shown make out a violation of constitutional right . . . . [T]he court must [also] decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id. at 815–16 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 129 S.Ct. 808).  In Saucier, the Supreme Court held that the two steps described above must always be conducted in the prescribed order—whether "the officer's conduct violated a constitutional right . . . must be the initial inquiry."  533 U.S. at 201.  In the recently decided case of Pearson, however, the Supreme Court held that "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  129 S.Ct. at 818.  Mindful of the Supreme Court's instruction and given the circumstances of the instant litigation, the Court exercises its discretion to follow the two-step protocol outlined in Saucier.

As discussed in Part V.C.1, *supra*, plaintiff has established a genuine issue of fact as to

whether he was fired from his law library job in retaliation for his publication of an article in the Black Star newspaper. This suffices, at the summary judgment stage, to show a violation of his First Amendment rights by C.O. North. Thus, the Court must turn to the remaining prong of qualified immunity analysis: "whether . . . defendant [North] is entitled to qualified immunity on the grounds that his conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Larsen v. Senate of Pa., 154 F.3d 82, 86–87 (3d Cir. 1998) (quoting Harlow, 457 U.S. at 818). In evaluating this prong, as plaintiff has established a genuine issue of material fact as to retaliation, it must be assumed that C.O. North retaliated against him for the exercise of his First Amendment rights. See Walker v. Schwalbe, 112 F.3d 1127, 1133 (11th Cir. 1997).

The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Saucier, 533 U.S. at 201. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Nevertheless, to find that a right is clearly established, there need not be "'a previous precedent directly in point.'" Acierno v. Cloutier, 40 F.3d 597, 620 (3d Cir. 1994) (quoting Good v. Dauphin County Soc. Servs. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989)); accord Anderson, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (internal citation omitted).

The right to be free from retaliation for exercise of First Amendment rights is clearly established. See Crawford-El v. Britton, 523 U.S. 574, 592 (1998); Perry v. Sindermann, 408 U.S. 593, 597 (1972) ("For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech."); Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) ("The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of his First Amendment rights."). The fact that the right is clearly established, however, does not end the qualified immunity analysis in the First Amendment retaliation context. The Third Circuit has described the inquiry in this context as follows:

> The qualified immunity analysis requires a determination as to whether reasonable officials could believe that their conduct was not unlawful even if it was in fact unlawful. In the context of a First Amendment retaliation claim, that determination turns on an inquiry into whether officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory.

Larsen, 154 F.3d at 94 (internal citation omitted). The court noted that "a bare allegation of retaliatory motive" is not "sufficient to defeat an assertion of qualified immunity as to a retaliation claim." Id. at 95. The court further explained that "[i]n some circumstances, the legitimate basis for the actions might be so apparent that the plaintiff's allegations of retaliatory motive could not alter the conclusion" that defendants are entitled to qualified immunity. Id.

In the instant case, C.O. North has not "undisputedly demonstrated that [his] motivations were fair." Russoli v. Salibury Twp., 126 F. Supp. 2d 821, 857 (E.D. Pa. 2000) (citations

omitted).  While defendants argue that plaintiff was terminated because his "close custody" status did not permit him to work in the law library, a factfinder reasonably could believe that this reason is merely pretextual.  Plaintiff's custody status had not changed from the time that he began working in the library until the time that he was terminated.  Moreover, plaintiff has provided more than a "bare allegation of retaliatory motive"; at his deposition, he testified that C.O. North, to explain why he was firing plaintiff, said "[i]f you're going to write, you know, stories like that about us, you know, in the newspaper then you're fired."  (Kantamanto Dep. 24:5–8.)  The factfinder could find that plaintiff was fired not because of his custody status but in retaliation for the publication of his article in the Black Star newspaper.[7]  If the factfinder found such a retaliatory motive, it would likely follow that C.O. North could not reasonably believe that this motivation was proper, satisfying the Larsen test.  154 F.3d at 94.

The factual disputes in the record preclude any decision with respect to qualified immunity at this stage in the litigation.  Accordingly, the Court denies defendants' Motion for Summary Judgment on the basis of qualified immunity with respect to C.O. North.

### D.    Fourteenth Amendment Due Process Claims

Plaintiff contends that his termination from his law library job violated his procedural and substantive due process rights under the Fourteenth Amendment.  Plaintiff's arguments, however, are unavailing.

---

[7] Defendants rely on Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 538 (E.D. Pa. 2002), in support of their assertion of qualified immunity.  In Allah, however, unlike in the instant case, the evidence in the record supported a finding that "the defendant prison officials had a legitimate basis" for their conduct.  Id.  The legitimacy of their conduct was so apparent that plaintiff's "bare allegations" of retaliatory motive were insufficient to defeat defendants' entitlement to qualified immunity.  Id.

To state a cognizable claim under the Due Process Clause, plaintiff must have either a liberty or a property interest in his law library job assignment. <u>James v. Quinlan</u>, 866 F.2d 627, 629 (3d Cir. 1989). The Third Circuit has held to the contrary, stating that "[w]e do not believe that an inmate's expectation of keeping a particular prison job amounts either to a 'property' or 'liberty' interest entitled to protection under the due process clause." <u>Bryan v. Werner</u>, 516 F.2d 233, 240 (3d Cir. 1975) (citing <u>Bd. of Regents v. Roth</u>, 408 U.S. 564 (1972)); <u>accord</u> <u>James</u>, 866 F.2d at 629–30. Moreover, "[t]raditionally, prisoners have had not entitlement to a specific job, or even to any job." <u>James</u>, 866 F.2d at 630 (citations omitted). Thus, plaintiff does not have a protected liberty or property interest in his law library job arising directly from the Due Process Clause itself.

Plaintiff further argues that PPS Policy 5.A.2 created a protected liberty interest in his law library job assignment.[8] (Pl.'s Resp. 28–29.) In particular, plaintiff argues that CFCF staff did not follow the termination and reassignment process outlined in PPS Policy 5.A.2 in terminating him from his law library job, thus violating his procedural due process rights. This argument is likewise unavailing. The Supreme Court has held that a state-created liberty interest may be entitled to due process protection but only in those situations where deprivation of that interest "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995); <u>accord</u> <u>Griffin v. Vaughn</u>, 112 F.3d 703, 706 (3d Cir. 1997). Plaintiff relies on a PPS policy rather than a state-created interest; nevertheless, it cannot pass the <u>Sandin</u> test. Failure to comply with the termination and

---

[8] Plaintiff cites to PPS Policy 5.A.5, but the relevant PPS Policy is 5.A.2. (<u>See</u> PPS Policy 5.A.2, Ex. K to Defs.' Mot.)

reassignment procedures of Policy 5.A.2 does not subject prisoners to an "atypical and significant hardship." Assuming *arguendo* that plaintiff's termination from his law library job violated Policy 5.A.2, such termination did not deprive him of a protected liberty interest or violate the procedural due process guarantee of the United States Constitution. As plaintiff did not have a protected liberty or property interest in his law library job assignment, the Court grants defendants' Motion for Summary Judgment with respect to plaintiff's Fourteenth Amendment due process claims.

### E.    Other Claims

Plaintiff avers that C.O. Theodore Jackson made threatening statements that were motivated by the publication of plaintiff's article and argues that these statements constituted verbal harassment, terroristic threats, and assault. (Kantamanto Aff. re Theodore Jackson.) Plaintiff, however, did not name C.O. Jackson as a defendant in this action. As C.O. Jackson was not properly made a party to plaintiff's lawsuit, plaintiff cannot pursue his claims against C.O. Jackson.

Plaintiff argues that the conduct that forms the root of his First Amendment retaliation claim likewise violated a number of other provisions of state, federal, and international law, including, *inter alia*, the Eighth Amendment to the United States Constitution; Article I, section 11 of the Pennsylvania Constitution; Article 23.1 of the Universal Declaration of Human Rights; and Pennsylvania state laws proscribing harassment, the making of terroristic threats, assault, and "conspiracy to conceal felonious conduct." Plaintiff's claims pursuant to these provisions are not colorable. Accordingly, the Court grants defendants' Motion for Summary Judgment with respect to these claims.

25

## VI.    CONCLUSION

For all of the foregoing reasons, the Court grants in part and denies in part defendants' Second Motion for Summary Judgment.  The Court denies defendants' motion with respect to plaintiff's First Amendment retaliation claim against C.O. North.  The Court also denies defendants' motion on the grounds of failure to exhaust and qualified immunity with respect to C.O. North.  The Court grants defendants' motion as to all other claims against C.O. North.  The Court grants defendants' motion as to all claims against Commissioner King and Deputy Warden Butler.